(No. 15420.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* TONY DAMICO *et al.* Plaintiffs in Error.

*Opinion filed October 20, 1923—Rehearing denied Dec. 7, 1923.*

1. CRIMINAL LAW—*when giving of a conspiracy instruction is ground for reversal.* It is prejudicial error in an arson case to give an instruction authorizing a verdict of guilty against the four defendants if the jury believe from the evidence that the defendants, or any of them, conspired to burn the building and pursuant to said conspiracy did burn it, where as to three of such defendants there is no evidence of any conspiracy except the incompetent subsequent statements of the other defendant, made in their absence.

2. SAME—*when statements of one defendant are not admissible against the others.* On the trial of four men for arson, statements of one of the defendants, made subsequent to the crime and out of the presence of the others, by which he implicated himself and the others in the commission of the crime, are admissible against him but not against the other defendants.

WRIT OF ERROR to the Circuit Court of Menard county; the Hon. GUY R. WILLIAMS, Judge, presiding.

F. O. R. BAKER, and WILLIAM E. FAIN, for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, HENRY E. POND, State's Attorney, and EDWARD C. FITCH, for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

Tony Damico, Joe Damico, Paul Hughes and George Jones were convicted of arson and have sued out a writ of error to reverse the judgment.

Tony Damico, who was thirty-four years old and had lived in Pawnee, in Sangamon county, since 1907, came to Petersburg in June, 1922, and bought the furniture, fixtures and stock of a pool room situated in a building on

309—37

the east side of the square, owned by George Reisch.   On
December 19, 1922, a fire occurred in this room and injured
or destroyed the furniture, fixtures and stock and damaged
the interior of the building.   Tony Damico and Joe Damico
were arrested on the night of the fire and were examined
the next day by the deputy State fire marshal but were dis-
charged from arrest.   About a month later, on the com-
plaint of the sheriff, founded upon information received
from Frances Hohimer and her husband, Albert, they were
again arrested, and at the February term of the circuit court
of Menard county they were indicted for causing the fire
and were tried and convicted.

In October, 1922, George P. Kern, an insurance agent,
solicited Tony Damico to insure his pool room, and on Oc-
tober 23 issued to him an insurance policy of the Albany
Insurance Company for $2500, insuring the billiard and
pool tables, fixtures and furniture for $1800 and the stock
for $700.   At the time Tony represented that he intended ·
to purchase a bowling alley.   This was to be installed in
the room, and $600 of the insurance on the furniture and
fixtures was intended to apply to the bowling alley.   There
were four of the pool tables.   Tony testified that he told
Kern what the billiard and pool tables cost him, and Kern
testified that after the fire Tony told him that he paid $800
for the pool tables and $400 for the billiard table; that it
was understood that Tony was over-insured unless the bowl-
ing alley was put in, and the $1800 was intended to cover
the bowling alley.   Kern also testified that he had been en-
gaged in merchandise in Petersburg for a number of years;
that Tony told him how much stock he had, and Kern
looked it over and thought he had about $700,—in the
neighborhood of what he stated,—and gave him a policy for
that amount on his stock.   There was also some evidence
tending to show that the pool tables were worth not more
than $100 or $125 each and that the stock was of trifling
value.

There were three fires in the room preceding that of December 19, the origin of none of which is disclosed by the evidence. The first occurred in the morning of December 15, at about 1:30 o'clock. It was in the part of the room occupied by one of the pool tables, one side of which, including the pocket, was burned, as well as a hole in the floor below, about three feet in diameter. The fire extended along the joists beneath the floor for some distance. It was soon extinguished by the fire department. In the basement, ten feet or more from the burned floor, was an old couch covered with carpet and stuffed with excelsior. It was not on fire but the firemen soaked it with water before leaving the premises. Later in the morning, about 6:30 o'clock, there was another alarm and this couch was discovered to be on fire. Firemen carried it out into the yard, which extended from the back of the building about twenty feet to the alley, and the fire was extinguished with chemicals. There was no other fire on the premises except on this couch, and it was a smouldering fire a little larger than a man's hand. A third fire was discovered about four o'clock the next morning, which was Saturday, December 16, in this same couch in the back yard. The night policeman saw a smoke back of the building. He went there and with the help of a man from a bakery three doors away extinguished the fire with water carried in buckets. There was a bundle of sticks wrapped with wire lying on the couch and burning. Tony Damico had gone to St. Louis on Sunday morning, December 10, to buy a bowling alley, but after going to several places returned to Petersburg the night of Wednesday, the 13th, and the next day went to Peoria, returning to Petersburg on Sunday morning, the 17th. During his absence he left the room in charge of his brother, Joe, who was unmarried and lived with Tony and his wife. He was a miner, as Tony had been also when he lived at Pawnee. On the night of December 19, about 10:15 o'clock, Virgil O. Whipp, who was county judge of Menard county,

was sitting in his office on the north side of the square, with two other men, when they discovered a fire in the pool room. They immediately went over to the pool room, Judge Whipp going first to the electric light plant to give the alarm. When the other two men arrived at the door of the building they saw a considerable blaze in the front part of the room, on the south side. The firemen arrived, kicked in the glass of the door and opened it. There was oil on the floor, running down the grooves of the boards and burning in the cracks. There was a muslin cloth, rolled up, lying on the floor, on fire. There was a smell like kerosene or gasoline. After the fire got the draft from the door it burned rapidly, scorched and burned the inside of the building and the tables and fixtures in the room. A glass jug, which had contained oil or gasoline but was practically empty, was found on the floor under the counter. After the fire was extinguished the fire chief kept the jug until the next morning and then turned it over to the sheriff.

Tony Damico testified that he was at home on the night of December 19; that he heard the fire whistle blow four times, indicating that the fire was on the square. He got up and dressed and started up-town. On the way he was told that the fire was at his pool room. He started to run, and when he got to the fire the fire chief told the night policeman to arrest him and take him to jail. He stated that he had nothing to do with starting the fire and knew nothing about it and denied all knowledge of the jug under the counter. When he came to Petersburg in June, 1922, he rented of George N. Johnson four rooms of a house consisting of seven rooms, the other three being occupied by Johnson while Tony and his wife occupied the four rooms until November 20. Johnson testified that about October 15 Tony came home at noon and his wife asked him if he had fixed the insurance. Tony said that he could get three times as much insurance on it as what it cost him, and that if it burned he wouldn't lose any further money in the busi-

ness. Johnson was standing in an adjoining room opposite a door between the two rooms, which was closed. He could not see Tony or his wife but was familiar with their voices. He was standing right against the door, at the washstand. He heard Mrs. Damico ask her husband, "If it burned would we get our insurance?" and Tony said, "Sure; we will do it." Tony denied that any such conversation occurred.

Paul Hughes, called "Rusty," and George Jones, called "Casey," were two young men twenty-three and twenty-four years of age, respectively, who had lived in Petersburg all their lives. They were in the habit of visiting the pool room and also a restaurant about three doors north of it. Hughes was seen by the night policeman on Saturday night, December 16, about half-past one, going into the alley which runs back of the pool room. Two or three doors south of the pool room was a bakery, the back door of which opened on this alley. The front door was kept locked at night but work was done in the back room. Shortly after seeing Hughes a policeman went to this back door, and Hughes was there with two other men who were working. The policeman went back to the hotel and about half-past three saw Hughes coming by the hotel. Hughes stayed there and talked with the other policeman awhile and then the two policemen made another round. The third fire occurred about four o'clock that morning. Hughes was seen at other times about the streets late at night, and he and Jones were seen several times apparently in close conversation with Tony or Joe Damico, but they separated when some other person approached.

Herbert Guinan, who is a cousin of Hughes and was employed at a garage filling station, testified that before December 19 he sold gasoline to Hughes in a gallon glass jug about the size and appearance of the one which was under the pool room counter, and that the Sunday night before the grand jury met he told Hughes he was going to swear

that he sold him the gasoline in a jug with a red stripe, in order to protect the Sweeney Company against liability for selling gasoline in a container not so marked, and that Hughes said to him not to tell it had a red stripe around it; that it was not a jug at all,—it was a can. He said if Guinan would not so testify, that Hughes could or would have him and the company arrested for putting gasoline in a white jug. Hughes and Jones were seen on the night of December 19, sometimes together and sometimes separately, on the square in the neighborhood of the pool room and in the restaurant a few doors away. A few minutes before the fire alarm was given, Jones went out of the restaurant and soon came back and said in an ordinary tone of voice, "Call the fire department; the pool room is on fire." Nobody paid any attention to him. He went out and came back and told them again to call the fire department, but no attention was paid to his request until smoke was seen coming by the door.

The above was substantially all the evidence which was given against Tony Damico, Hughes and Jones. There was no evidence which would justify an inference that the three, or any two of them, had conspired together or with anybody else to set fire to the pool room. The court gave to the jury this instruction:

"The court instructs the jury, that if you believe, from the evidence, beyond a reasonable doubt, that the defendants, or any of them, together or with others, prior to the fire in question, entered into a conspiracy to willfully and maliciously burn the building in question as charged in the indictment, and you further believe from the evidence, beyond a reasonable doubt, that thereafter said conspirators, or any of them, pursuant to said conspiracy and in furtherance thereof, willfully and maliciously set fire to and burned said building as charged in the indictment, then such defendants, if any, as entered into said conspiracy, are guilty of the crime of arson."

Because there was no evidence that any of these three defendants entered into a conspiracy to burn the building it was error to give this instruction, and it was particularly harmful because of the statements of Joe Damico, to be referred to hereafter, which were not competent against the other three defendants and were received only against Joe and which would tend to show a conspiracy by all four of the defendants. For the giving of this instruction the judgment must be reversed as to the three defendants named.

In regard to Joe Damico the case is different. Albert Hohimer, a young man twenty-two years old, worked occasionally for Tony Damico, mopping up the floor of the pool room. His wife, who was eighteen years old, testified that Joe, after he came to Petersburg, was a visitor at her home, coming first to see her husband and later came there frequently when her husband was not at home. He came nearly every night when he got through work and their relations were friendly. On December 24 he came there when nobody was there but herself and her baby. She said to him that she was a pretty good friend of his and asked if he would not tell her about the fire,—who did it and all. He said if she would promise one thing he would tell her. When she asked what that was he said, "When we get our insurance will you promise me to run off with me?" She made no promise but said, "Go on and tell it." He said in answer to her questions that they had it set on fire; that "Rusty" Hughes and "Casey" Jones did it; that his brother, Tony, gave him the key and he gave it to Rusty, and Rusty went in the front door with the jug of gasoline and Casey went around to the back and they set some oiled rags on fire in there. She said, "Joe, are you sure of it?" He said, "Don't you tell anybody." She said, "What would you do if I told George Clary?" He said, "Don't you dare do that; it would get Tony and I both in bad." She went to Springfield on Saturday, December 30, to visit her sister and remained away until January 8. While there the

sheriff of Menard county called upon her with her husband and she told him of this conversation with Joe. The sheriff gave her three dollars. After her return Joe came to her house on January 11. His language to her was insulting, and she ordered him out of the house and he left. An hour or so later he came back, and, as she testified, tried to play good then,—tried patting her on the shoulder. He said he was not mad; he did not mean it; he was just kidding; and in that conversation she got to playing good to him and asked him how much he paid to set the pool room on fire. She said that she never told what he had told her before and asked again what was paid, and he told her that Tony gave him $200 and he gave $100 to Rusty and the other $100 to Casey for setting the pool room on fire. She went again to the sheriff and told him her conversation with Joe and the sheriff paid her $24.85 more. Still later the sheriff at different times gave her $10 and $2, which she said she borrowed of him and expected to re-pay but the sheriff said he gave to her.

Albert Hohimer testified that about December 24, in the afternoon, coming home into the back room he heard someone talking and went to the middle door to see who it was. He heard Joe Damico talking to his wife. He heard her ask him about the fire in the pool room and he told her how it was set on fire. He told her Hughes and Jones set it on fire. He said they had coal oil rags put on the floor and Hughes went in the front door and opened the back door for Jones to get it. Hohimer testified that two days later he talked with Joe Damico about that conversation. He asked Joe who set it on fire, and Joe said he didn't know. Hohimer then told him he heard the conversation that Joe and his wife had, and then Joe told him the conversation. Hohimer asked him what he did it for, and Joe said to get the insurance. Joe said to him if the sheriff ever sent for him to ask him anything, not to tell him anything. He came

down to the depot to talk to Hohimer the day after the fire. The sheriff sent for Hohimer to come to his office, talked with him five or six times and paid him $25 on the first of January. He told the sheriff about the conversation between Joe and his wife just before the first of January. After his wife went to Springfield he went there with the sheriff, who called with him upon her at the house of her sister, where she was visiting, and the sheriff had a talk with Mrs. Hohimer.

Joe Damico denied having any such conversations with Mrs. Hohimer or her husband as were testified to by them. If such conversations actually occurred and he made the statements to which they testified he was properly found guilty of arson. It was a question of the credibility of the witnesses, and in such case the court will not interfere with the verdict of the jury unless there is manifestly reasonable doubt of the defendant's guilt or the verdict has been reached through passion or prejudice. The mere fact that the defendant contradicts the testimony of the witnesses for the prosecution is not of itself sufficient to establish a reasonable doubt, and it cannot be said on this evidence that the verdict was the result of passion or prejudice. The statements of Joe Damico were competent evidence against himself but were not competent against the other three defendants. The error in giving the instruction affected only the other three but had no effect on the verdict so far as Joe is concerned.

The judgment as to Joe Damico will be affirmed but as to the other three defendants it must be reversed and the cause will be remanded.        *Reversed and remanded.*